**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

**BILLIE FAYE KEYES; JOSHUA**                                      **PLAINTIFFS**
**ALLEN; COURTNEY RENA FORTUNE;**
**KARLI FORD MATTHEWS; SHELTON**
**S. MATTHEWS**

**V.**                                   **CAUSE NO. 3:16-CV-00228-CWR-LRA**

**PHILIP GUNN; MARK BAKER;**                            **DEFENDANTS**
**RICHARD BENNETT; CHARLES JIM**
**BECKETT; BILL DENNY; THE**
**MISSISSIPPI HOUSE OF**
**REPRESENTATIVES**

## MEMORANDUM OPINION AND ORDER

> *"The deference usually given to the judgment of legislators does not extend to decisions concerning which resident citizens may participate in the election of legislators and other public officials. Those decisions must be carefully scrutinized by the Court to determine whether each resident citizen has, as far as possible, an equal voice in the selections."*
>
> *Kramer v. Union Free Sch. Dist. No. 15*, 395 U.S. 621, 627 (1969).

Mississippians select members of the State House of Representatives ("the House") through popular election. The people consented to this form of governance in the Constitution of 1890, trusting that their ballots would be treated fairly.

In this case, five voters claim the House breached that trust by intentionally discarding their ballots to change the outcome of an election. They allege a violation of rights secured by the Equal Protection Clause of the Fourteenth Amendment. Defendants deny all allegations of impropriety. They insist their actions are justified by state law, and that this Court has no jurisdiction to adjudicate plaintiffs' claims.

This case presents the question: if state legislators intentionally discard ballots to swing an election, may the disenfranchised voters bring suit in federal court to enforce the guarantee of equal protection? Yes, they can.

## I.      Factual and Procedural History

On November 3, 2015, Mississippians voted in state-wide general elections. Among the positions on the ballot was the legislative seat held by incumbent Blaine Eaton. Eaton was the State Representative for District 79, which is comprised of Smith County as well as a portion of Jasper County.

The race for District 79 could not have been closer. As required by state law, the Smith County election commissioners certified the total number of votes cast county-wide, as well as the number of votes cast in each precinct. *See* Miss. Code Ann. § 23-15-603. Those certifications were transmitted to the Secretary of State, who tabulated the results and submitted them to each branch of the Legislature. *See id.* § 23-15-603(3) ("Certified county vote totals shall represent the final results of the election."). The District 79 race resulted in a tie between Eaton and challenger Mark Tullos; each received 4,589 votes. Associated Press, *GOP-Majority Panel to Hear Challenge Over Mississippi House Seat*, JACKSON FREE PRESS, Dec. 1, 2015.

Approximately one week after the votes were certified, Eaton and Tullos drew lots to break the tie, in accordance with state law. *See* Miss. Code Ann. § 23-15-605. Under the watchful eyes of the Secretary of State, the Governor, legislators, party officials, members of the media, and general onlookers, Eaton won the election by drawing the long straw. Richard Fausset, *Democrat Wins Mississippi House Race After Drawing Straw*, N.Y. TIMES, Nov. 20, 2015. When Mississippi's 2016 legislative session convened, Eaton was sworn in and seated by the House as the Representative of District 79. His service would not last long.

The tie-breaking ceremony garnered a great deal of attention because much more than a single legislative seat was at stake. As one reporter explained:

> With his victory, Eaton blocks the GOP from having a supermajority in the House, a three-fifths margin that would have allowed Republicans, in theory, to make multimillion-dollar decisions about taxes without seeking help from Democrats . . . . A Tullos victory would have given Republicans 74 seats in the 122-member House. They already have a supermajority in the 52-member state Senate, and Gov. Phil Bryant is Republican. Democrats in the current term have blocked Republicans' efforts to pass hundreds of millions of dollars' worth of tax cuts.

Emily Wagster Pettus, *Mississippi Republicans Literally Drew Straws to Break an Election Tie*, BUSINESS INSIDER, Nov. 21, 2015.

Tullos filed a petition with the House contesting the election.[1] Arielle Dreher, *Election Disputes: No Bibles, and Lots of Swearing*, JACKSON FREE PRESS, Jan. 20, 2016. Republican Speaker of the House Philip Gunn appointed Republican Mark Baker, Republican Richard Bennett, Republican Charles Jim Beckett, Republican Bill Denny, and Democrat Linda Coleman to a special committee, charging them to investigate and consider the election challenge. Associated Press, *GOP-Majority Panel to Hear Challenge Over Mississippi House Seat*, JACKSON FREE PRESS, Dec. 1, 2015.

The committee voted along party lines to discard five of the nine affidavit ballots counted by Smith County election commissioners and the Secretary of State.[2] Coleman criticized the committee's recommendation as a "trumped up report based upon a trumped-up law." Jimmie Gates, *House Votes for Republican Tullos, Unseats Eaton*, CLARION-LEDGER, Jan. 21, 2016. The

---

[1] The contents of that petition remain a mystery, as it has not been made a part of this record.

[2] Also a mystery is which ballots the special committee invalidated because it never identified who it determined had voted illegally. What is certain, however, is that at least one of plaintiffs' ballots was among those discarded. Defendants considered only nine affidavit ballots and they chose to eliminate five. Therefore, between one and five of plaintiffs' ballots were canceled.

House then adopted the special committee's resolution, nullified the results of the tie-breaker, declared Tullos the winner of the election, and manufactured a Republican supermajority. *Id.*

On March 30, 2016, Billie Faye Keyes, Joshua Allen, Courtney Rena Fortune, Karli Ford Matthews, and Shelton S. Matthews ("plaintiffs"), residents of Smith County, filed their complaint with this Court. They allege that their affidavit ballots—all cast for Eaton—were counted by the Smith County election commissioners and the Secretary of State, then jettisoned by the special committee of the House in violation of the Equal Protection Clause.

Plaintiffs' claims are predicated on well-established principles. The Supreme Court has underscored repeatedly the importance of open, honest elections and equal opportunity for civic participation. More than 100 years ago, while considering an election to Congress, the Court regarded it as "unquestionable that the right to have one's vote counted is as open to protection . . . as the right to put a ballot in a box." *United States v. Mosley*, 238 U.S. 383, 386 (1915). The Court later extended that right to elections for state officials. "[W]henever a state or local government decides to select persons by popular election to perform governmental functions, the Equal Protection Clause of the Fourteenth Amendment requires that each qualified voter must be given an equal opportunity to participate in that election." *Hadley v. Junior College Dist. of Metro. Kansas City, Mo.*, 397 U.S. 50, 56 (1970); *see also Dunn v. Blumstein*, 405 U.S. 330, 336 (1972) (collecting cases). The protective penumbra cast over state elections by the Equal Protection Clause has not diminished in the passing decades. "Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush v. Gore*, 531 U.S. 98, 104-05 (2000) (citation omitted).

Nevertheless, defendants argue that the doors to the federal courthouse are closed. First, they claim this Court lacks authority to hear this case. Then they invoke Eleventh Amendment

immunity and legislative immunity. Finally, they argue that the special committee of the House was entitled to make individualized factual determinations about the sufficiency of plaintiffs' ballots.

## II.   Threshold Questions

"[F]ederal courts are courts of limited jurisdiction, having only the authority endowed by the Constitution and that conferred by Congress." *Halmekangas v. State Farm Fire and Cas. Co.*, 603 F.3d 290, 292 (5th Cir. 2010) (quotation marks and citation omitted). "Lack of subject matter jurisdiction may be found in any one of three instances: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) (citation omitted). "Ultimately, a motion to dismiss for lack of subject matter jurisdiction should be granted only if it appears certain that the plaintiff cannot prove any set of facts in support of his claim that would entitle plaintiff to relief." *Id.* (citation omitted).

### A.   Election Contests and Equal Protection

An election contest is fundamentally different from an equal protection challenge, and the distinction between them is pertinent to this action. An election contest seeks to determine which candidate "received a majority of the votes legally cast." *Hubbard v. Ammerman*, 465 F.2d 1169, 1176 (5th Cir. 1972). An equal protection claim, by contrast, examines whether the votes cast by plaintiffs were subjected to treatment different from others similarly situated. *See, e.g.*, *Wilson v. Birnberg*, 667 F.3d 591, 599 (5th Cir. 2012). The former audits the election outcome, while the latter examines the election process.

Defendants argue that this Court lacks subject matter jurisdiction because "Congress did not vest the District Courts with jurisdiction to resolve election contests for State Legislatures." Docket No. 5 at 1. They focus on *Hubbard v. Ammerman*, which states in relevant part: "there is no Act of Congress which has conferred upon federal district courts jurisdiction to hear and decide, *solely as an election contest*, what candidate received a majority of the votes legally cast in an election for state or local office." 465 F.2d at 1176 (emphasis added). Defendants point to the section of the complaint asking that "[Eaton's] position in the Mississippi House of Representatives be restored unto him," Docket No. 1 at 11, and argue that *Hubbard* renders that remedy unavailable.

The Court agrees. To the extent plaintiffs seek an order determining who received a majority of votes or declaring Eaton the lawful Representative of District 79, that portion of the complaint must be dismissed. This Court lacks jurisdiction to grant those remedies.

That does not, however, limit this Court's ability to consider plaintiffs' equal protection claims.[3] The Supreme Court "has made clear that a citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction." *Dunn*, 405 U.S. at 336 (citations omitted). Plaintiffs may pursue redress for an alleged malfunction in the electoral process which rendered their votes unequal. They seek the same treatment received by other affidavit ballots cast in the election. That is a claim this Court can adjudicate.

The analysis here is intuitive. States have the power to conduct their own elections, but they do not possess the power to deprive their citizens of rights protected by the U.S.

---

[3] Defendants argued at length in their papers and at oral argument that 28 U.S.C. § 1344 controls the present suit and altogether prevents this Court from exercising jurisdiction. Counsel's contention, however, was foreclosed by the Supreme Court nearly 50 years ago. *See Powell v. McCormack*, 395 U.S. 486, 516 (1969) ("[T]here is absolutely no indication that the passage of this Act [28 U.S.C. § 1344] evidences an intention to impose other restrictions on the broad grant of jurisdiction in § 1331.").

Constitution. *See Gomillion v. Lightfoot*, 364 U.S. 339, 347 (1960) ("When a State exercises power wholly within the domain of state interest, it is insulated from judicial review. But such insulation is not carried over when state power is used as an instrument for circumventing a federally protected right.").

> In a representative democracy value determinations are to be made by our elected representatives, and if in fact most of us disapprove we can vote them out of office. Malfunction occurs when the *process* is undeserving of trust . . . . Obviously our elected representatives are the last persons we should trust with identification of . . . these situations.

JOHN HART ELY, DEMOCRACY AND DISTRUST: A THEORY OF JUDICIAL REVIEW 103 (1980) (emphasis in original). The allegations here present one of those distortions of process over which federal courts have jurisdiction.

Other courts agree. "[J]urisdiction is not defeated by . . . the bare fact that states have primary authority over the administration of elections." *Hunter v. Hamilton Cty. Bd. of Elections*, 635 F.3d 219, 232 (6th Cir. 2011) (citation omitted). "That federal courts are constrained in an area does not mean that they must stand mute in the face of allegations of a non-frivolous impairment of federal rights." *Id.*; *accord Johnson v. Hood*, 430 F.2d 610, 613 (5th Cir. 1970) (determining that in the context of a state election "a claimed denial of equal protection by state action would arise under the Constitution"). Federal question jurisdiction is present here.

### B.   Eleventh Amendment: *Ex Parte Young*

Defendants raise Eleventh Amendment immunity as a shield to this suit. The Amendment "bars suits by private citizens against a state in federal court . . . . Yet, few rules are without exceptions." *Okpalobi v. Foster*, 244 F.3d 405, 411 (5th Cir. 2001) (en banc) (citation omitted). One of these exceptions is found in *Ex Parte Young*, 209 U.S. 123 (1908).

*Ex Parte Young* held that the Eleventh Amendment does not preclude suits seeking injunctive relief against state officials who commit unconstitutional acts. "[B]ecause a sovereign state cannot commit an unconstitutional act," the Court reasoned, "a state official enforcing an unconstitutional act is not acting for the sovereign state and therefore is not protected by the Eleventh Amendment." *Barber v. Bryant*, --- F. Supp. 3d ---, 2016 WL 3562647, at *16 (S.D. Miss. June 30, 2016) (quoting *Okpalobi*, 244 F.3d at 411).

*Ex Parte Young* requires a demonstration "that the state officer has 'some connection' with the enforcement of the disputed act." *K.P. v. LeBlanc*, 627 F.3d 115, 124 (5th Cir. 2010) (quoting *Young*, 209 U.S. at 157). If such a connection is found, then the Court "need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002) (quotation marks, brackets, and citation omitted).

These requirements are satisfied here. By treating plaintiffs' ballots unequally, the individual defendants have some connection with the constitutional violation alleged. Plaintiffs also claim an ongoing deprivation: through intentional elimination of their votes, defendants deprived each individual plaintiff of his or her civic voice not just for the 2016 legislative session, but also the 2017, 2018, and 2019 sessions, and any special session called during those years. The relief requested is properly characterized as prospective. Plaintiffs seek an order from this Court mandating equal treatment of their ballots for the remainder of the legislative term. The legal fiction of *Ex Parte Young* removes the cloak of the State and makes the individual defendants amenable to this suit.

8

What remains is whether the House itself is entitled to Eleventh Amendment immunity. Defendants urge the Court to embrace the reasoning in *Hall v. Louisiana*, 974 F. Supp. 2d 944 (M.D. La. 2013). In *Hall*, the Louisiana Legislature argued that it could not be sued for passing a Judicial Election Plan. The court agreed, holding that plaintiff had failed to sufficiently allege an enforcement connection between the Legislature and the Plan, as required by *Ex Parte Young*. *Id.* at 954.

The disputed act in *Hall*, however, delegated enforcement to officials outside the legislative body. The Louisiana Legislature, while it crafted the Plan, did not enforce the unconstitutional act. *Id.* By contrast, defendants here entered the realm of enforcement. They undertook and completed the alleged unconstitutional act themselves, never delegating authority to anyone outside the Legislature. They canceled the ballots.

Plaintiffs maintain that *Bond v. Floyd* authorizes federal courts to hear suits against a legislative chamber, notwithstanding the Eleventh Amendment. 385 U.S. 116 (1966). In *Bond*, the Supreme Court held that the Georgia House of Representatives' refusal to seat Julian Bond violated his First Amendment rights.[4] Bond brought suit against the Speaker of the Georgia House and several representative members of the chamber, but did not name the Georgia House itself as a defendant. *Bond v. Floyd*, 251 F. Supp. 333, 335 (N.D. Ga. 1966). In a unanimous decision, the Supreme Court implicitly held that the presence of the individual defendants, named in their official capacities, was sufficient for the Court to enjoin the action taken by the chamber. 385 U.S. at 131 ("We conclude as did the entire court below that this Court has jurisdiction to review the question of whether the action of the Georgia House of Representatives

---

[4] The facts in *Bond* are remarkably similar to the facts in this case. "Hearings were conducted before a special committee of the House which, by majority report, recommended that Mr. Bond be excluded. The House, adopting that report, excluded him by passing House Resolution 19 by majority vote." Jurisdictional Statement and Motion to Advance at 6, Bond v. Floyd, 385 U.S. 116 (1966) (No. 87), 1966 WL 115343, at *6.

deprived Bond of federal constitutional rights."); *see also Verizon Md.*, 535 U.S. at 645

("Whether the Commission waived its immunity is another question we need not decide, because

. . . [plaintiff] may proceed against the individual commissioners in their official capacities

pursuant to the doctrine of *Ex Parte Young*."). This Court need not determine whether the House

is subject to *Ex Parte Young*, as the individual defendants provide sufficient basis for plaintiffs to

proceed.

C.     **Legislative Immunity**

Defendants next argue they are entitled to legislative immunity. They rely upon *Tenney v.*

*Brandhove*, in which the Supreme Court found that legislative immunity was "carefully

preserved in the formation of State and National Governments here." 341 U.S. 367, 376 (1951).

Legislative immunity protects actions, not individuals. *Bryan v. City of Madison, Miss.*,

213 F.3d 267, 272 (5th Cir. 2000); *see also Da Vinci Inv., Ltd. P'ship v. Parker*, 622 F. App'x

367, 372-73 (5th Cir. 2015). "And absolute [legislative] immunity only protects those duties that

are functionally legislative, not all activities engaged in by a legislator." *Bryan*, 213 F.3d at 272

(citing *Hughes v. Tarrant Cty. Tex.*, 948 F.2d 918, 920 (5th Cir. 1991)). The grant or denial of

the privilege, then, hinges on the nature of defendants' action.

In making this determination, the Court turns to two guideposts erected by the Fifth

Circuit:

> The first test focuses on the nature of the facts used to reach the given decision. If
> the underlying facts on which the decision is based are legislative facts, such as
> generalizations concerning a policy or state of affairs, then the decision is
> legislative. If the facts used in the decisionmaking are more specific, such as those
> that relate to particular individuals or situations, then the decision is administrative.
> The second test focuses on the particularity of the impact of the state action. If the
> action involves establishment of a general policy, it is legislative; if the action
> singles out specific individuals and affects them differently from others, it is
> administrative.

*Hughes*, 948 F.2d at 921 (quotation marks, citations, and brackets omitted).[5]

Here, the challenged conduct was not legislative under either test. The decision to discard votes was made on a voter-by-voter basis, requiring individualized application of Mississippi Code § 23-15-13 and § 23-15-573. To apply those statutes defendants apparently investigated where each voter lived, when he or she moved to that location, and whether or not he or she submitted a proper written request to transfer precincts or wards, culminating in rejection of each plaintiff's duly filed affidavit ballot. None of those facts are generalizations that in any way concern policymaking. Rather, they are specific and relate to a single individual. The impact of defendants' action is also individualized. Discarding each vote affected only the voter who cast it. Defendants did not, by discarding any vote, engage in establishing a law or policy for future voters. *See, e.g.*, *Parker*, 622 F. App'x at 372 ("The denial . . . did not involve the determination of a policy, but, instead, applied general rules . . . to one specific piece of property.").

For these reasons defendants may not avail themselves of legislative immunity.

## III.    The Merits of Plaintiffs' Complaint

The Federal Rules of Civil Procedure require "a pleading [to] contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009) (quoting Fed. R. Civ. P. 8(a)(2)). "[T]he pleading standard . . . does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). To determine whether to grant or deny dismissal, the Court "take[s] the well-pled factual allegations of the complaint as true and view[s] them in the light most favorable to the

---

[5] The *Hughes* court discussed various tests for determining whether an action was protected by legislative immunity, and "did not choose any one of these particular standards, but instead used them as general guidelines." *Bryan*, 213 F.3d at 273. This Court relies upon those same guidelines.

plaintiff[s]." *Lane v. Halliburton*, 529 F.3d 548, 557 (5th Cir. 2008) (citing *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007)). If plaintiffs "have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed." *Twombly*, 550 U.S. at 570.

"To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988) (citations omitted). Defendants concede that they acted under color of state law. Determining if plaintiffs have stated a claim turns on whether they have alleged the violation of any right secured by the U.S. Constitution or a federal statute.

The parties argue over the existence of a federally *created* right to vote in state elections. The point is not germane. The Supreme Court has plainly declared that "the Constitution of the United States *protects* the right of all qualified citizens to vote, in *state* as well as in federal elections." *Reynolds v. Sims*, 377 U.S. 533, 554 (1964) (emphasis added). Once a State has given its citizenry the right to vote, the administration of that grant is subject to the federal guarantee of equal protection. *Harper v. Virginia State Bd. of Elections*, 383 U.S. 663, 665 (1966). This Court has previously found it "well established . . . that a citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction." *McLaughlin v. City of Canton, Miss.*, 947 F. Supp. 954, 974 (S.D. Miss. 1995) (quotation marks and citation omitted). Therefore, the question is whether plaintiffs have adequately pled an equal protection claim.

This case differs from more conventional race or sex-based equal protection challenges. Each of the plaintiffs proceeds as a class-of-one. The Fifth Circuit articulated, in *Wilson v. Birnberg*, what a plaintiff must show to advance a class-of-one claim:

> The usual equal protection challenge is that a statute discriminates on its face . . . against certain protected groups or trenches upon certain fundamental interests. Equal protection also protects against the unlawful administration by state officers of a state statute fair on its face, resulting in unequal application to those who are entitled to be treated alike. To be a class of one, the plaintiff must establish (1) he was intentionally treated differently from others similarly situated and (2) there was no rational basis for any such difference.

667 F.3d at 599 (quotation marks, brackets, and citations omitted). In the election context, the Court must determine whether defendants are alleged to have engaged in "willful conduct . . . undermin[ing] the organic processes by which candidates are elected." *Gamza v. Aguirre*, 619 F.2d 449, 452 (5th Cir. 1980) (quotation marks and citation omitted).

Plaintiffs allege that defendants "voted to deny the federal constitutional rights of the Plaintiffs . . . [and] disenfranchised qualified voters . . . [by] casting out affidavit ballots." Docket No. 1. The complaint does not claim that these deprivations were in part or in whole the result of defendants' negligence. Rather, plaintiffs' action is premised upon intentional misconduct—they allege a naked power grab.

Taking these allegations as true, as the Court must at this stage, they state a claim that defendants intentionally treated plaintiffs differently from others voting by affidavit ballot, and there was no rational basis for the disparate treatment beyond an impermissible desire to alter the outcome of the election. *See, e.g.*, *Wilson*, 667 F.3d at 600 ("[Plaintiff] alleged intentional discrimination, not unintended irregularities . . . . The complaint claimed enough. Further proceedings are needed.").

**IV.     Conclusion**

Defendants' first motion to dismiss is granted to the extent that this Court lacks jurisdiction to determine the outcome of the election. It is denied in all other respects. The remaining motions to dismiss are denied, except that the House's motion for Eleventh Amendment immunity is moot. The parties are directed to contact the Magistrate Judge's chambers within 10 days to obtain a scheduling order.

**SO ORDERED**, this the 27th day of January, 2017.

s/ Carlton W. Reeves
UNITED STATES DISTRICT JUDGE